IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2024 Session

## STATE OF TENNESSEE v. CHRISTOPHER R. SMITH

**Appeal from the Circuit Court for Lake County**
**No. 15-CR-10137    Tony A. Childress, Chancellor**

_____

### No. W2023-00342-CCA-R3-CD
_____

A Lake County jury convicted the Defendant, Christopher R. Smith, of two counts of aggravated assault, a Class C felony. The trial court sentenced the Defendant as a career offender to consecutive fifteen-year sentences for each conviction. On appeal, the Defendant asserts that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgment in Count 1 for aggravated assault, modify Count 2 to a conviction for assault, and remand for entry of an amended judgment and sentencing on Count 2.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Modified in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Mitchell A. Raines, Assistant Public Defender – Appellate Division, Franklin, Tennessee; Martin L. Howie (at trial) and Joseline Pugh (at trial), Dyersburg, Tennessee, for the appellant, Christopher R. Smith.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Danny H. Goodman, Jr., District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant failing to follow a correctional officer's instruction and an ensuing fight, which occurred on February 21, 2015. The Defendant, an inmate at Northwest Correctional Facility, was outside his assigned unit to visit a former cellmate when Corporal Stephan Coleman approached. Corporal Coleman asked the

Defendant for his ID card to write him up for being outside his assigned unit, and the Defendant attacked Corporal Coleman. Correctional Officer Jamie Scheland attempted to assist Corporal Coleman, and all three men fell to the floor during the struggle. Later that same day, Tennessee Bureau of Investigation ("TBI") Special Agents Stuart McLemore and Justin Tubbs met with the Defendant, who provided a statement. A Lake County grand jury indicted the Defendant for the aggravated assault of Corporal Stephen Coleman and the aggravated assault of Correctional Officer Jamie Scheland.

The Defendant filed a motion to suppress his statement to the TBI agents. Following an evidentiary hearing on the motion, the trial court concluded that the Defendant's statements to the TBI agents were voluntary and denied the motion to suppress.

At trial, the State presented three witnesses TBI Agent Justin Tubbs and the two victims of the assault, Officer Scheland and Corporal Coleman. The Defendant testified in his own defense. Agent Tubbs testified that he assisted in the investigation of the assault involving the Defendant and two correctional officers. He and Agent Stuart McLemore met with the Defendant on the same day of the assault. The interview was audio recorded and played for the jury.

On the audio recording, the Defendant stated he was not supposed to be in the unit, but he went to the unit to check on Mr. Rinearson, his "time companion." He denied that Corporal Coleman hurt him but said that Corporal Coleman "reached up" and that caused him to feel threatened. He could not recall the details of the fight. The only thing he could remember was that "there was two men on [him]," and he was going to "get[ ] two men off [him]."

Officer Scheland testified that inmates are assigned to a particular cell in a specific unit. Inmates are not allowed to move freely between units and must obtain a pass before they are allowed to move between their assigned unit and another unit. On February 21, 2015, Officer Scheland was on duty in unit twelve. He saw the Defendant enter the unit and go to cell one to see inmate Joey Rinearson. The Defendant had not been given permission to be in unit twelve. Shortly after the Defendant entered cell one, Corporal Coleman, Officer Scheland's supervisor, entered the unit and went to cell one. Corporal Coleman was in the cell briefly before exiting and shutting the door behind him. Corporal Coleman made a phone call in the office at the center of "the pod." Corporal Coleman then returned to cell one, and Officer Scheland followed. Officer Scheland confirmed that Corporal Coleman was following procedure for a situation where an inmate is in an unauthorized location.

Officer Scheland observed Corporal Coleman tell the Defendant to exit the cell or Corporal Coleman would "write him up" for being in an unauthorized location. The

2

Defendant walked out of the cell and told Corporal Coleman, "if [Corporal Coleman] was going to write him up, [the Defendant] was going to go to MAX." Officer Scheland testified that, typically, inmates are assigned to "MAX" for assaultive behavior, not for a minor infraction such as being in an unauthorized area. After making this statement, the Defendant struck Corporal Coleman in the face with a closed fist.

Officer Scheland testified that he attempted to intervene by pulling the Defendant off Corporal Coleman. As the three men struggled, they moved through the kitchen doors and fell to the floor. Officer Scheland said that he landed on his back and hit his head on the concrete floor. Corporal Coleman was on the ground to the right of Officer Scheland, and the Defendant was on top, straddling the two correctional officers. The Defendant's primary focus was Corporal Coleman, but the Defendant struck Officer Scheland in the face twice, bit his arm, and kicked him. Eventually, Corporal Coleman was able to escape, but Officer Scheland remained on the concrete floor with the Defendant above him. The Defendant helped Officer Scheland off the floor, telling him that if he did not leave something worse would occur.

The State questioned Officer Scheland about the injuries sustained during the incident as follows:

> Q. Okay. Did you have to seek any medical treatment as a result of this incident?
> A. I just had to receive medical treatment over the bite that I received.
> Q. Okay. Well, did you suffer any lingering injuries as a result of this, or any lingering conditions?
> A. I had a migraine for a month over that.
> Q. Okay. For a whole month, you suffered a migraine?
> A. Yes, sir.
> Q. Okay. But I take it, eventually it did go away?
> A. Yes, sir.

Officer Scheland denied that, before the incident, either he or Corporal Coleman had done anything to provoke the assault. He denied threatening, hitting, or attempting to hit the Defendant before the Defendant's attack.

On cross-examination, Officer Scheland testified that, prior to this incident, he had never had "any problems" with the Defendant. He confirmed that the Defendant's bite to his arm did not puncture the skin.

3

Corporal Coleman testified that, on February 21, 2015, he was supervising in "the yard" or area outside the housing units when he became aware of an inmate that was in an unassigned unit without permission. The Defendant was assigned to housing unit nine and was in housing unit twelve without permission. When Corporal Coleman spoke to the Defendant, the Defendant told Corporal Coleman that he was checking on his friend who might have a heart problem. When asked if he consulted with his supervisor to determine how to address the infraction, Corporal Coleman stated, "I'm sure I did," but he qualified that he had partial memory loss due to this incident.

Corporal Coleman recalled instructing the Defendant to exit the cell and asking him for his ID card. He could not recall whether the Defendant gave him his ID card or whether he informed the Defendant that he intended to "write [the Defendant] up for being in an unauthorized location." Corporal Coleman told the Defendant he was going to call his supervisor, the Defendant said "No," and then he recalled the Defendant's "hand coming toward his face." Corporal Coleman denied raising his voice, threatening the Defendant, or making any aggressive movement toward the Defendant in the minutes leading up to the assault.

The State played the video recording of the assault, and Corporal Coleman identified himself, Officer Scheland, and the Defendant in the video. Corporal Coleman stated that he "got knocked out" and when he regained consciousness, the Defendant had his finger in Corporal Coleman's eye. He described the location of the Defendant's finger saying, "It was behind my eye because that's where they sewed it up." During the assault, Corporal Coleman clearly remembered the Defendant stated, "I'm gonna end this, because I'm going to MAX." Corporal Coleman believed the Defendant meant that he intended to kill Corporal Coleman. Corporal Coleman stated that he had not had any previous issues with the Defendant but that, "if the Defendant had been written up again, he would have been over on points, and he would've been moved." Corporal Coleman explained that when points for disciplinary infractions are accumulated, a change in security level could be required for a Defendant based upon the number of points accrued. The Defendant had exceeded the point limit and, thus, had he been written up, he would have been moved to another facility.

An ambulance transported Corporal Coleman to Union City Hospital where he was then transported to Memphis for a specialist to repair "the tear" in his eye. As a result, Corporal Coleman had "[m]any surgeries" but ultimately still lost sight in his eye due to the 100% retinal detachment. Corporal Coleman's treatment at Charles Retina Institute was for an indefinite period, and he was "forced" to retire due to the injury to his eye.

The Defendant testified that he was "tattooing" in unit twelve when some inmates told him that Joseph Rinearson, the Defendant's friend, required his assistance to go to the

clinic because he was having heart trouble. The Defendant went to Mr. Rinearson's cell and was preparing a "cold rag" for Mr. Rinearson when Corporal Coleman entered the cell and asked what was "going on." The Defendant responded that he was taking Mr. Rinearson to the clinic and Corporal Coleman replied, "No, I know what you're in here doing" and locked the Defendant inside the cell. Corporal Coleman returned, unlocked the door, and asked about the Defendant's ID. The Defendant held his ID up for Corporal Coleman to see and put his foot in the door to prevent Corporal Coleman from locking him in again. The Defendant recalled Corporal Coleman made no accusations, but his tone of voice implied that the Defendant was not being truthful about why he was in the cell.

The Defendant exited the cell, and Corporal Coleman began saying that the Defendant was "going to the hole." The Defendant told Corporal Coleman that his punishment did not matter and to "please get [Mr. Rinearson] to the clinic." The Defendant became agitated when Corporal Coleman failed to notify the clinic of Mr. Rinearson's need for medical attention and instead focused on taking the Defendant "to the hole." The Defendant held up his ID again for Corporal Coleman, and Corporal Coleman said, "Nah, I gotcha gay-boy" and lifted his radio to the side of Corporal Coleman's head. The Defendant described Corporal Coleman's movements as aggressive. Due to past trauma from assaults with radios, when Corporal Coleman raised his radio, the Defendant "went into self-defense mode."

The Defendant explained his response as follows:

> I got conditioned in this environment, I don't like being - - at the time, I didn't like being in prison, period. I did not like physical altercations. I try to be as peaceful as possible; I try to do what is helpful as possible. But there are times when you have no choice in a matter, no matter what you do, violence is coming your way period.

The Defendant confirmed that he felt threatened during his interaction with Corporal Coleman. He acknowledged that Corporal Coleman did not touch him first because Corporal Coleman "didn't really have much of an opportunity." The Defendant reacted "[a]s soon as that radio came to the side of [Corporal Coleman's] head." He did not intend to harm Corporal Coleman, he only wanted to prevent being beaten with the hand-held radio.

The Defendant testified that he felt genuine sadness for his interaction with Officer Scheland but that Corporal Coleman was responsible for the altercation escalating. He said that, during the altercation, Officer Scheland told him that he would get Mr. Rinearson medical attention and that was "what brought [him] back." The Defendant did not recall biting Officer Scheland but did remember Corporal Coleman biting the Defendant.

5

On cross-examination, the State asked the Defendant why he did not tell the TBI agents that he had been attempting to take Mr. Rinearson to the infirmary. The Defendant responded that someone had tampered with the audio recording of the interview. When asked about the consequences of his accumulation of disciplinary points, the Defendant denied that he was over the disciplinary point maximum and that the only consequence would have been thirty days in the hole. He maintained that he would not have been moved to another facility.

The Defendant agreed that he had been removed from Unit twelve. He explained that inmates were trying to separate him from Mr. Rinearson because the inmates were a threat to Mr. Rinearson, and the Defendant tried to protect him. After being removed from unit twelve, the Defendant stated that he kept returning, with permission, to keep Rinearson company. When asked about discrepancies in his statement and trial testimony, the Defendant could not explain why, in his statement to the TBI agents, he told them that he thought Corporal Coleman was reaching to grab him and yet he testified that Corporal Coleman was moving his radio to the side of his head.

The Defendant testified that he did not recall any of the altercation once the men were on the floor of the kitchen due to "tunnel-vision type state-of-mind." The Defendant stated that he could not get away from the two men even though he was on top of them. He claimed that, while on top of the two correctional officers, he was telling them to leave him alone. He stated that he attempted to extricate himself several times and walk away, but the two correctional officers had a strong hold on him.

When asked why he continued to yell and kick at Officer Scheland once Corporal Coleman had escaped, he said that he was "displaying a dominance, hoping that [Officer Scheland] cools down enough to where he don't feel vindictive if I was to step back and then decide to go for a Round Two." He explained that he used this strategy based upon the violence he had experienced while in prison. He perceived Officer Scheland as a threat even though he was lying on the floor, and the Defendant stood over him.

After hearing the evidence, the jury convicted the Defendant of two counts of aggravated assault. After a sentencing hearing, the trial court imposed consecutive fifteen-year sentences for an effective sentence of thirty years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence is insufficient to support his convictions. Specifically, he argues that the evidence "was insufficient to show that [the

Defendant] was not acting in self-defense" and that the State failed to prove that Officer Scheland sustained serious bodily injury. The State responds that the Defendant's claim of self-defense was sufficiently rebutted and that the evidence supports the finding that both victims sustained serious bodily injury.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

7

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly caused serious bodily injury to the victim. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(A)(i). "'Serious bodily injury' includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(37). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(3). The subjective nature of pain is a fact to be determined by the trier of fact. *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed.*

The evidence, viewed in the light most favorable to the State, showed that the Defendant attacked Corporal Coleman. Corporal Coleman found the Defendant in an area where he was not authorized to be and, in the process of citing the Defendant for this infraction, the Defendant hit Corporal Coleman. A struggle ensued and Officer Scheland attempted to assist Corporal Coleman. All three men moved into the kitchen area where they fell to the ground with Officer Scheland hitting his head against the concrete as he fell, and the Defendant falling on top of him. The Defendant straddled the two correctional officers who were lying on the concrete floor, restraining both men and punching them. Although not clear from the video, the Defendant gouged Corporal Coleman's eye causing a completely detached retina. Corporal Coleman has had multiple surgeries to correct his vision with no success. Officer Scheland was treated in the infirmary for the bitemark left by the Defendant and suffered from a migraine headache for a month. Eventually, Corporal Coleman escaped from the Defendant's grip, leaving Officer Scheland on the ground with the Defendant standing over him yelling. The Defendant kicked Officer Scheland but ultimately helped him stand up and ordered him to leave. This is sufficient evidence upon

which a rational jury could conclude that the Defendant caused serious bodily injury to Corporal Coleman but not as to Officer Scheland.

We recognize that the distinction between bodily injury and serious bodily injury "is generally a question of fact for the jury and not one of law." *State v. Hurt,* No. E2020-00236-CCA-R3-CD, 2021 WL 1329460, at *8 (Tenn. Crim. App. April 9, 2021), *no perm. app. filed.* Further, as the State correctly notes, juries can use their collective knowledge, experience, and common sense when reaching factual determinations, and a rational jury could find that a migraine headache lasting a month constitutes extreme physical pain. *See State v. Keen*, 31 S.W.3d 196, 212 (Tenn. 2000) (stating "[a] jury's ability to use its collective knowledge, experience, and common sense to assist in reaching a determination in these weighty and complex matters is the very strength of the jury system"). In this case however, Officer's Scheland's testimony about his injuries was quite brief to prove the existence of a serious bodily injury.

> Q. Okay. Did you have to seek any medical treatment as a
>      result     of this incident?
> A. I just had to receive medical treatment over the bite that I
>      received.
> Q. Okay. Well, did you suffer any lingering injuries as a result
>      of this, or any lingering conditions?
> A. I had a migraine for a month over that.
> Q. Okay. For a whole month, you suffered a migraine?
> A. Yes, sir.
> Q. Okay. But I take it, eventually it did go away?
> A. Yes, sir.

The State was required to prove that Officer Scheland's injury involved: (A) a substantial risk of death; or (B) protracted unconsciousness; or (C) extreme physical pain; or (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(37). Officer Scheland's singular statement – "I had a migraine for a month over that" - about his injury does not prove, beyond a reasonable doubt, that the injuries met the statutory definition of "serious bodily injury." The State failed to put on any evidence with respect to the severity, impact, frequency, or treatment of the migraine headaches that would be necessary to show serious bodily injury as opposed to bodily injury. *See State v. Prince*, No. M2020-01302-CCA-R3-CD, 2021 WL 5710541 at *8, (Tenn. Crim. App. Dec. 2, 2021). There was no testimony from Officer Scheland that he suffered extreme physical pain caused by the migraine, or that he received any medical treatment other than for the bite. As noted above, the jury may use its collective knowledge, experience, and common sense, but it may not speculate as to whether Officer Scheland suffered extreme physical

pain without any evidence to support such a finding beyond a reasonable doubt. Accordingly, the Defendant's conviction of aggravated assault involving serious bodily injury must be modified to a conviction of assault.

The Defendant also argues that the proof showed that he acted in self-defense and, therefore, there was insufficient evidence to support his convictions. If a defendant has a genuine, well-founded fear that he was in danger of death or great bodily harm, self-defense is an available plea. *State v. Gilbert*, 612 S.W.2d 188 (Tenn. Crim. App. 1980). The genuineness of his fear may be shown by surrounding circumstances. *Frazier v. State*, 100 S.W. 94 (1906). The issue of self-defense is a matter for the jury to decide. If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence. *Arterburn v. State*, 391 S.W.2d 648 (1965); *Grainger v. State*, 13 Tenn. (5 Yerg.), 458, 462 (1830).

The jury heard the State's version of the events through Corporal Coleman and Officer Scheland, and viewed the surveillance video that showed the Defendant grabbing Corporal Coleman and the ensuing fight where the Defendant straddled the correctional officers with his legs while delivering punches to both as they attempted to resist him. The jury also heard the Defendant testify that he acted in fear based upon his institutional experiences in the past. He agreed that he made the first contact. Moreover, the Defendant expressed little to no remorse, blaming his actions and the ensuing events on Corporal Coleman for his attempt to follow prison procedure for addressing inmates in unauthorized areas. By its verdict, the jury rejected the Defendant's argument that he attacked Corporal Coleman in self-defense. We will not disturb the jury's findings. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing, we affirm the trial court's judgment as to Count 1 and modify the conviction in Count 2 to assault and remand the case to the trial court for entry of an amended judgment and sentencing as to Count 2.

_____
ROBERT W. WEDEMEYER, JUDGE